# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**JASON L.,**

     **Plaintiff,**

**v.**                        **CIVIL ACTION NO. 3:23-cv-00307**

**MARTIN J. O'MALLEY**
**Commissioner of Social Security,[1]**

     **Defendant.**

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Jason L. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a Period of Disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. By standing order, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's *Brief in Support of Motion for Judgment on the Pleadings* (ECF No. 8), and the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 9).

---

[1] Commissioner O'Malley was substituted in place of Acting Commissioner Kilolo Kijakazi following O'Malley's appointment on December 20, 2023.

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 8), **GRANT** the Commissioner's request to affirm his decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.   BACKGROUND

### A. *Information about Claimant and Procedural History of Claim*

Claimant was born on October 15, 1972, and was 47 years old on his alleged onset date and 49 years old when the Administrative Law Judge ("ALJ") rendered her decision, defining him as a younger person at all times during the relevant period. (Tr. 28, 311, 315.)[2] The Claimant has a limited education. (Tr. 28.) Claimant was last employed in 2014, shoveling coal on belt lines at Arch Coal where he worked for 11 years. He previously worked in logging, cutting timber. His longest period of employment was 11 years, when he worked as a heavy-machinery operator. (Tr. 601.)

Claimant protectively filed the subject DIB and SSI applications on September 17, 2020, alleging disability beginning on December 5, 2019—just one day after the most recent prior unfavorable decision was entered by the Social Security Administration ("SSA"), (Tr. 10, 74, 311, 315.)[3] Claimant alleges that he became disabled on December

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 6.

[3] Claimant previously filed applications for DIB and SSI in July 2015 and in December 2018 (Tr. 104-05, 131-32). Claimant's July 2015 applications were denied by an ALJ decision on December 8, 2017, and his subsequent December 2018 applications were denied by an ALJ decision on December 4, 2019. *See id.* In the most recent previous decision dated December 4, 2019, a different ALJ determined that Claimant was able to perform a range of light, unskilled work. The vocational expert indicated that there were other jobs available in the national economy that the claimant was able to perform. The Appeals Council denied the claimant's request for review on July 30, 2020. Claimant did not appeal the prior ALJ's decision, meaning that the Appeals Council's decision became administratively final on February 3, 2020—sixty days after the decision was made. (Tr. 10.)

5, 2019, due to osteoarthritis, bilateral carpal tunnel syndrome and associated surgery, scoliosis, shoulder problems, dislocated hip, depression, anxiety, obsessive-compulsive disorder ("OCD"), agoraphobia, bipolar disorder, neck problems, Tourette's syndrome, high blood pressure, high cholesterol, ADHD, low IQ, autism, acid reflux, diabetes Type II, with ulcers on feet as well as vision problems. (Tr. 161.) Both the DIB and SSI applications were denied initially on January 24, 2021, and on reconsideration on October 28, 2021. (Tr. 103, 130, 161, 171.)

Thereafter, the Claimant filed a written request for hearing, which was received by the SSA on November 10, 2021. (Tr. 235.) Following Claimant's request for a hearing, Administrative Law Judge ("ALJ") Karen B. Kostol conducted an administrative hearing in Morgantown, West Virginia on July 11, 2022 (Tr. 43). The Claimant, who was represented by his counsel, provided sworn testimony; additionally, Tanja Hubacker—an impartial vocational expert ("VE")—offered testimony as well. *Id.* In a July 20, 2022 decision, the ALJ denied Claimant's application (Tr. 7). Subsequently, the Appeals Council denied Claimant's request for review on February 3, 2023, thus rendering the ALJ's July 20, 2022 decision the final decision of the Commissioner. (Tr. 1).

In light of the Commissioner's unfavorable decision, Claimant timely brought the instant action on April 4, 2023 seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed a transcript of the administrative proceedings on May 31, 2023. (ECF No. 6). Claimant subsequently filed his *Brief in Support of Judgment on the Pleadings* (ECF No. 8) on June 30, 2023, and in response, the Commissioner filed his *Brief in Support of Judgment on the Pleadings* on July 28, 2023 (ECF No. 9). As such, this matter is fully briefed and ripe for adjudication.

### B. Relevant Evidence

The undersigned has considered all relevant evidence of record pertaining to Claimant's arguments, including the medical evidence, and summarizes those portions here for the convenience of the United States District Judge.

### 1. Treatment Records

The medical records include treatment that predates the relevant time period, prior to the filing of the claims that are the subject of the instant § 405(g) review in this matter on September 17, 2020. On July 31, 2009, well before the relevant period, Claimant had surgery for carpal tunnel syndrome. (Tr. 646-648.) A September 11, 2009 operative report from Three Gables Surgery Center listed preoperative diagnoses of carpal tunnel syndrome and cubital tunnel syndrome, both of which were in Claimant's left hand. *Id.* Postoperative notes reflect that procedures for "Left carpal tunnel, release," and "Left cubital tunnel release" were performed without complication. (TR 646-649).

Six years later on September 29, 2015—four years before the alleged onset date—Claimant presented to Dr. Charles Giangarra for Right Intra-articular hip injection for degenerative joint disease of the right hip (Tr. 650-61). Treatment notes state that Claimant tolerated the procedure well. (Tr. 651.)

Two years later on February 7, 2017, Claimant presented to Marshall Health for an x-ray of his left hand. (Tr. 583.) The x-ray impression found "no evidence of acute fracture or malalignment," with unremarkable soft tissues, and no evidence of a radiopaque foreign body. (Tr. 584.) Some foreshortening of the second metacarpal was noted, and the provider stated that the issue was likely developmental (Tr. 583-584). The following month on March 21, 2017, Claimant presented for a follow-up where it was noted that his

blood glucose exceeded 200; in response, Claimant's provider refilled his medications and instructed him to follow up in six weeks (Tr. 578-580).

On April 14, 2017, Claimant was diagnosed with schizoaffective disorder with mild suicidal ideation and insomnia (Tr. 677). Treatment notes indicated symptoms of irritability, anger outbursts, impulsivity with poor judgment, excessive talking and distractibility. *Id.* Claimant reported a history of paranoia and agoraphobia, as well as psychosis beginning in 2012, involving auditory hallucinations of large insects who encourage him to be impulsive. *Id.* He further reported severe anxiety with excessive worrying, agitation, and restlessness; he feels uncomfortable in crowds and public settings, when standing in line, or when in enclosed spaces. He reported having panic attacks two to eight times every day (Tr. 677). Claimant's symptoms history revealed severe anxiety, a moderate change in appetite, apathy, depression, distractibility, guilt, high/low energy, hope/helplessness, loss interest in activities, mania, panic, hostility, change in sleep patterns, impulsivity, verbal aggression, withdrawal, hallucinations, delusions, paranoia, poor concentration, and suspiciousness (Tr. 677-684).

On May 3, 2017, Claimant presented to his primary-care provider and reported that he was unable to go to Walmart or be around a lot of people (Tr. 655-658). Additionally, he reported a number of symptoms including trouble sleeping, anxiety, generalized worry, three to four daily panic attacks that interfered with his functioning, heart flutters, shortness of breath, tingling in the arms, feeling ice cold and dizzy, gastrointestinal upset, poor energy, motivation, focus, and memory, difficulty falling asleep and staying asleep, high anxiety, low mood, depression at an eight on a scale from one to ten, episodes of going days days with only an hour or two of sleep, bizarre dreams with periodic feelings of euphoria, and muscle tension. *Id.* Claimant explained that he

struggled with anxiety since age 14; however, he stated that he did not have a history of suicide attempts. He also reported a history of anger, starting in about 2015, as well as a history of impulsive episodes where he would drive at unsafe speeds, experience hypersexual feelings or feelings of rage and anger, and at times, difficulty remembering what happened when these episodes end. *See id.* Further, Claimant's provider noted the following symptoms:

> Also has tic moving neck and 1 side quickly. Feels excessively dirty and will take multiple showers daily. Can't stand if dishes are in sink and washes them thoroughly. Can't stand messy coffee table. Had learning d/o in math and reading. Also has stutter that comes and goes since childhood. Delayed speech onset. H[istory] of speech therapy, lack interest in others socially growing up. Over stimulated by bright lights and loud noise. Past meds: Celexa used to help but doesn't now, Buspar.

(Tr. 655-658). In response to Claimant's reported symptoms, his provider increased the dose of his Celexa mediation and added a prescription for Abilify. *See id.* Claimant presented for a follow-up appointment shortly thereafter on May 17, 2017, to assess the effectiveness of his medications (Tr. 689). It was noted that the medication was helping; he reported reduced shaking, and his mood was improving more every day. *Id.* However, Claimant rated his anxiety at a seven out of ten, and reported still experiencing panic attacks. *Id.*

The following month on June 22, 2017, Claimant returned to his primary-care provider for follow-up on medicine management. (Tr. 575.) There, the provider noted that Claimant was following with Dr. Novotny, an orthopedist, for stenosing tenosynovitis of the right long finger, bilateral cubital tunnel syndrome, bilateral carpal tunnel syndrome, bilateral pronator syndrome, and medical epicondylitis. (Tr. 573.) Additionally, the treatment notes from this visit indicate that Claimant had past medical history of osteoarthritis (Tr. 575). Returning on July 19, 2017, Claimant complained of

shaking a little throughout day, and his provider associated this symptom with a previously-noted involuntary tic. *Id.* He also stated that his dreams had picked up once more, and he had specific nightmares about insects again. He rated his anxiety at a seven on a scale from one to ten. (Tr. 694).

The following year on March 14, 2018, Claimant returned to his primary-care provider for follow-up medicine management. Treatment notes from this visit that Claimant had Hyperlipidemia, diabetes type II, anxiety disorder, hypertension, and acid reflux. The provider prescribed a new medication, Januvia, for his diabetes and also increased his current prescription, glipizide ER, to 10mg twice daily (Tr. 563-567).

On November 13, 2018, Claimant returned for a checkup and reported that he had depression nearly every day (Tr. 558). Claimant added that his symptoms caused extreme difficulty when trying to do his work, take care of things at home, or get along with other people (Tr. 558). He reported symptoms of having little interest or pleasure in doing things; feeling down, depressed, or hopeless; trouble falling asleep; feeling tired or having little energy; poor appetite or overeating; negative self-thoughts; trouble concentrating on things; and moving or speaking slowly. *Id.* Additionally, Claimant reported that he was experiencing thoughts of hurting himself. *Id.* The provider noted that Claimant had a "severe depression" score of 27. On April 14, 2017 claimant presented to Prestera and reported symptoms of depression with anxiety with fearfulness around crowds with panic attacks daily and reports of auditory hallucinations involving giant insects and paranoia (Tr. 653).

On August 7, 2019, just before the start of the relevant period in December 2019,

Claimant presented to his primary-care provider and was seen by Whitney McCormick, FNP-C, for a six month follow-up appointment regarding his hypertension, diabetes, hyperlipidemia, and generalized anxiety (Tr. 551). Claimant reported that his diabetes was stable with no history of diabetic ketoacidosis and no medication side effects (Tr. 551-52). On examination, he had some reduced sensation of his feet, but his gait, station, feet, and toes were normal (Tr. 554-55). His prescriptions were renewed and he was instructed to continue on his current medication.

Turning to the relevant time period in December 2019, Claimant's treatment for his physical impairments consisted primarily of medication management for his various medications, and follow-up appointments for his Type II diabetes. At these follow-up visits, his physical exams were often unremarkable. Likewise, Claimant had little consistent formal mental health treatment during this time period, instead treating predominantly with medications that successfully controlled his symptoms. In August 2019, he had no depression, reported that his anxiety disorder was stable, and denied any difficulty with concentration, restlessness, panic attacks, racing thoughts, suicidal ideation, or side effects from medication (Tr. 551-52).

On December 19, 2019, however, Claimant was admitted to Three Rivers Medical Center positive for suicidal ideations with a plan to overdose (Tr. 481-86). He reported hearing voices and having auditory hallucinations of people laughing at him. He was hospitalized for approximately six days, and discharged to return home on December 29, 2019, with a discharge diagnosis of Bipolar I disorder with psychotic features and with mixed features. Additional diagnoses were hypertension, diabetes mellitus type II, hypercholesterolemia, GERD, and a history of hip fracture (Tr. 199). Claimant's Psychosocial Factors were noted to be "financial stress," and "unable to work." *Id.*

8

Furthermore, he reported a history of depression and panic attacks, and reported positive delusions of reference as well as persecutory delusions (Tr. 481). Claimant steadily improved with treatment, however, and was noted to have "returned to baseline status" at discharge with good mood and affect, no suicidal or homicidal ideation, no hallucinations, delusions, or paranoia, intact memory and concentration, and improved judgment and insight (Tr. 481). This improvement was reflected at follow-up appointments in February and July 2020, where Claimant reported "doing well" overall, denying medication side effects, and "doing well with his goals" (Tr. 533, 539).

In February 2020, he reported poor control of his diabetes and was prescribed Ozempic; however he was unable to start it due to issues with his insurance, and his physical exam again reflected generally unremarkable findings, and no issues with ambulation (Tr. 538-42). Similarly, treatment notes from July and August 2020 reflect that Claimant continued to struggle with controlling his blood sugar, but he had a generally normal physical exam, stable foot pain, no medication side effects, and normal gait and station (Tr. 529-30, 533-35).

In January 2021, Claimant reported poorly controlled blood glucose levels and displayed some decreased sensation in his foot, but his musculoskeletal and neurological systems were both normal with an unremarkable physical exam (Tr. 611-12).

Later in January 2021, Claimant had a telehealth appointment for his mental health issues (Tr. 617-20). He displayed a sad mood but was positive regarding the future, and his mental status was generally normal with intact memory, concentration, judgment, and insight (Tr. 618-20). He reported being off his medications for the past few months, and his prescriptions were updated *Id*. Later in September 2021, Claimant's

depression screening revealed symptoms of depression, but his mood was calm and appropriate with no suicidal thoughts, and his treatment was limited to medication (Tr. 630-32). In November 2021, he displayed no depression on screening, and his mood was again appropriate (Tr. 644-45).

At his next diabetes-management follow-up appointment in September 2021, Claimant again had no issues with his gait, musculoskeletal system, or neurological symptoms (Tr. 631-32). At his one-month follow up in October 2021, he was able to start Ozempic and reported "feeling much better" over the previous month, with no musculoskeletal or neurological issues (Tr. 644-45). In November 2021, he again reported fluctuating glucose numbers but denied any issues or concerns, and had an unremarkable physical exam and no difficulty with ambulation (Tr. 716-18).

Claimant continued to attend follow-up appointments throughout 2022, and his condition remained generally unchanged. In January, February, March, and June 2022, he continued to report fluctuating blood glucose levels and some tingling, burning, and numbness in his feet, but he had no muscle weakness, no fatigue, and no issues with ambulation, as well as generally unremarkable physical exams (Tr. 704-05, 708-09, 713-14, 745-47).

In March 2022, he had an appointment with a podiatrist due to foot pain and numbness, where he displayed some decrease in sensation and tenderness (Tr. 732-33). Diagnostic images of his foot were normal, and he was educated on proper foot care, stretching and icing, and referred to physical therapy (Tr. 733-34). However, there is no evidence on the record indicating whether he pursued physical therapy.

Claimant had an appointment in April 2022 where he reported knee pain (Tr. 736-41). An x-ray reflected "[v]ery minimal osteoarthritis" with the questionable

presence of a foreign body within the soft tissues of unknown etiology (Tr. 740-41). However, his motor strength and sensation were both intact (Tr. 736-37). He had a follow up in June 2022, where he reported having no difficulty with knee movement, normal ambulation, and normal range of motion (Tr. 742).

Finally, in January, February, March, and June 2022, Claimant continued to treat with his primary care physician for his mental-health impairments. (Tr. 705-06, 709-10, 713-14, 745-46). Claimant was noted to be displaying anxiety, but there no depression or psychiatric issues were noted at examinations, and his mental-health treatment remained focused on prescription medication. *See id*.

### 2. *Opinion Evidence*

On December 14, 2020, Claimant had a consultative exam at Aspire Occupational Rehabilitation for an adult mental status examination. He reported bipolar disorder with anxiety and panic attacks, as well as hearing voices telling him to hurt himself. (Tr. 599.) He reported that these symptoms worsened starting in 2011 (Tr. 599). Additionally, Claimant complained of physical problems with a "bad hip," diabetes, and "bad hands/elbows," as well as a history of carpal-tunnel surgery. He stated that his hands stay numb and swell up, and that he could only stand for twenty minutes at a time due to pain.

On exam, he was properly attired, cooperative, and oriented, but had an anxious mood and affect (Tr. 602). His thought process was normal, with no evidence of delusions, paranoia, obsessive thoughts, compulsive behaviors, or unusual perceptual disturbances. *Id*. He also had normal judgment, fair insight, mild psychomotor agitation, no suicidal or homicidal ideation, mildly impaired immediate memory, moderately impaired recent memory, normal remote memory, severely impaired

concentration, normal persistence, and somewhat slow pace *Id*. He was diagnosed with an unspecified bipolar disorder, panic disorder, and mild intellectual disability *Id*. Claimant cited work interference complications from pain, functional limitations, mood instability, auditory hallucinations, anxiety, and a history of learning difficulties. (Tr. 600). He reported a history of academic difficulties, special education placement, and grade retention, and it was noted that "[p]ast testing in 2015 was suggestive of FSIQ within 55-70 range." *Id*.

The examiner noted that Claimant was prescribed medication with his physician in Louisa, Kentucky, where he also participated in therapy; additionally, he reported treating at Marshall Psychiatry. The examiner further noted that Claimant was hospitalized for a week in 2019 at Three Rivers in Huntington, West Virginia due to suicidality; additionally, Claimant's medical history was positive for osteoarthritis, bilateral carpal tunnel syndrome surgery, scoliosis, shoulder problems, a dislocated hip, neck problems, high blood pressure, high cholesterol, acid reflux, and diabetes type II causing ulcers on feet and vision trouble (Tr. 600). Claimant's medications included human mixed insulin, blood pressure and cholesterol medication, and Protonix for his stomach; he also stated that he is prescribed Abilify, Buspar, Celexa, and Trazadone.

Turning to Claimant's educational background, the examiner noted Claimant completed the tenth grade at Tolsia High School where he received below-average academic performance; he also participated in special ed classes. He was retained twice, once in Kindergarten and again in the second grade. (Tr. 601). The examiner then noted Claimant's daily activities: he reported arising at seven each morning to eat breakfast and take his medications, after which he watched tv and went back to sleep. He reported going outside his home occasionally, but generally he eats dinner by five in the evening

and then showers, watches tv, and takes his medications. He did not report a consistent bedtime. (Tr. 603.) Additionally, Claimant reported that he bathed himself twice per week, but he required assistance with some dressing tasks such as tying his shoes. Recounting his social history, Claimant reported that he never goes to the store, dines out, or runs errands due to physical issues and panic attacks. He used to enjoy hunting/fishing but he reported that he was no longer participating in these hobbies. He did report, however, that he was able to attend medical appointments, maintain his own checking acct, and pay bills himself (Tr. 602).

The examiner noted that Claimant demonstrated fair insight as well as evidence of mild psychomotor agitation. *Id*. Turning to Claimant's mental-health impairments, the examiner found that Claimant's immediate memory was mildly impaired, his recent memory was moderately impaired, his concentration was severely impaired,  his pace was slow, and his social functioning was mildly impaired (Tr. 602-603). The examiner's diagnosis was unspecified bipolar and related disorder, panic disorder, and mild intellectual disability. Finally, she opined that Claimant may need assistance managing funds due to intellectual disability (Tr. 603).

State agency medical consultant Uma Reddy, M.D. conducted a review of Claimant's records for the initial evaluation of her claim. Dr. Reddy found that Claimant could lift/carry 20 pounds occasionally and ten pounds frequently, stand/walk for six hours, and sit for six hours in an eight-hour workday (Tr. 115, 142). Additionally, she found that Claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 116, 143). Finally, Dr. Reddy found that Claimant should  avoid  concentrated exposure to extreme cold, extreme heat, vibration, and pulmonary irritants, as well as even moderate exposure to hazards (Tr. 117, 143-44.)

State agency psychological consultant Joseph Richard, Ed.D. reviewed medical records regarding Claimant's mental functioning. (Tr. 122.) Mr. Richard found that Claimant could complete work-like activity and was capable of understanding and remembering one-to-two-step instructions (simple routine repetitive: unskilled) but not detailed and complex directions, and he could carry out one-to-three-step instructions, but not detailed tasks. Further, he found that Claimant could attend to tasks for up to two hours at a time throughout an eight-hour day with a minimal production quota, and that he "may" have difficulty relating to the public and coworkers, but he could accept supervision and deal appropriately with criticism, and could manage stress, adjust to a task setting, and deal with normal changes once familiar (Tr. 122, 149.)

At the reconsideration level, state agency medical consultant Narendra Parikshak, M.D. and psychological consultant Timothy Saar, Ph.D., each found that Claimant's condition was unchanged from the ALJ decision of December 4, 2019 (Tr. 83, 166-67, 176-67). More specifically, they opined that Claimant was capable to undertake the following activities: lifting/carrying/pushing/pulling twenty pounds occasionally, and 10 pounds frequently; sitting or standing for six hours, and walking for five hours in a work day, except the combination of standing and walking cannot exceed six hours per work day. He can operate foot controls bilaterally frequently. He can frequently reach in all directions, including overhead, bilaterally. He can handle, finger, and feel items frequently bilaterally. The Claimant can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, balance frequently, stoop frequently, kneel frequently, crouch occasionally, and crawl occasionally. The Claimant can never work at unprotected heights, with heavy or hazardous machinery, and can operate a motor vehicle frequently. He can work in extreme cold frequently and in

vibration occasionally. Finally, they opined that Claimant can perform simple, routine tasks and interact occasionally with the public. *Id.*

### 3. *Hearing Testimony*

Claimant, who was represented by counsel, as well as a vocational expert ("VE") appeared and testified at the hearing before the ALJ on July 11, 2022. (Tr. 43.) Claimant testified that a typical day for him consisted of sitting around house or going to doctor appointments. His wife and son are responsible for household chores such as maintaining the yard. (ECF No. 57-58.) Claimant testified that he does not have any license or certifications. His past work included positions as a load operator, dozer operator, and service/laborer. (Tr. 50).

Claimant testified that his physical impairments caused pain throughout his lower back, hips, and feet (Tr. 52-53). He stated that he received injections for his hip problems after he broke his right hip in 1999. He has bad arthritis in it (Tr. 53). Claimant testified that he underwent hip injections before his alleged onset date and recently began taking medications for numbness and tingling in his feet, but had no formal treatment for his back pain other than a brace (Tr. 53- 54). He did not do chores and estimated that he could lift no more than five pounds, stand for approximately three to four minutes, or walk a half-block, and had issues performing tasks with his hands (Tr. 57-58).

As for his mental health impairments, Claimant testified that he had depression and anxiety as well as issues with concentration and memory. *Id*. He was treated primarily with medication through his family doctor (Tr. 56). He also reported significant limitations in his function reports, alleging that he performed no chores, spent his days watching television, and struggled to walk for extended periods (Tr. 349-53, 367-72). In response to the ALJ's request that Claimant state in his own words what prevented him

from working, Claimant testified that he has bad hips and knees, his feet hurt, as well as lower-back and shoulder pain, extreme diabetes, depression, anxiety, high cholesterol, high blood pressure, and acid reflux (Tr. 52).

Claimant complained of lower back pain and testified that he wears a brace. He also complained of numbness/tingling in his feet for past 3 years for which he is prescribed medication. (Tr. 54.) Additionally, Claimant testified he can only lift 5lbs due to carpal tunnel syndrome preventing him (Tr. 58). He can only stand 3-4 minutes because his hips hurt and he has to sit down. He can only walk ½ block and has difficulty sitting because of his hips and back hurting (Tr. 58). Claimant recounted that he had complained of pain in both shoulders for several years. In 2010 he had carpal tunnel surgery (Tr. 55). He had "extreme" diabetes with an A1c of 11/12; as a result, he was prescribed 6 shots of insulin a day and along with a weekly shot. He also reported that 90% of the time, his blood glucose levels were generally around 290. Claimant also testified that he got dizzy and passed out 2 months ago (Tr. 56). According to Claimant, his medications provided a maximum relief of about 40% (Tr. 54).

### 4. Other Evidence

Claimant's school records provided additional details regarding his academic performance in primary and secondary school. One high school official noted her opinion that the Claimant, who was sixteen years old at the time, "should remain in special education," where his recommended focus "[s]hould be geared toward survival skills" (Tr. 402). A March 8, 1985 Report of Psychological Evaluation from the Wayne County Board of Education indicated that Claimant, who was in first grade at the time, had a full-scale IQ of 69; with a Verbal IQ score of 74, and a performance score of 67. The Evaluation concluded that these results "suggest[] that Jason's ability falls within the borderline to

mildly mentally impaired range," with a concurrent deficit in visual motor integration (Tr. 402-408). The Evaluation ultimately concluded that Claimant's skills cluster score on the IQ test "indicate[d] that he has mastered the skills necessary to function successfully on a mid-first grade level." (Tr. 406.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step. At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the

available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable

impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an

adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded at the first step that Claimant had not engaged in substantial gainful activity since his alleged onset date of December 5, 2019 (Tr. 14). At the second step, the ALJ found Claimant had the following severe impairments: mild scoliosis of the spine; remote dislocation of right hip in 1998 with mild degenerative changes of that hip; residual effects, status post bilateral carpal tunnel release in 2009; hypertension; hyperlipidemia; Type II diabetes mellitus; obesity; borderline intellectual functioning; bipolar disorder; and anxiety disorder (Tr. 15). At the third step, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15-16).

Next, the ALJ found that Claimant had the residual functional capacity to perform "light work," as defined in 20 CFR 404.1567(b) and 416.967(b). Next, before turning to the fourth step, the ALJ determined Claimant's RFC and found he was able to perform light work with the following additional limitations:

> [Claimant is] capable of frequent operation of foot controls with the bilateral lower extremities; capable of frequent reaching in all directions with the bilateral upper extremities; capable of frequent fingering, handling, and feeling with the bilateral upper extremities; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, crouch and/or crawl; can frequently balance, stoop, and/or kneel; must avoid concentrated exposure to extreme cold and/or extreme heat; must avoid moderate or occasional exposure to excessive vibration; must avoid all exposure to any hazards, such as dangerous moving machinery and unprotected heights; capable of simple, routine, and repetitive tasks; capable of occasional interaction with the general public, co-workers, and supervisors; and capable of no fast paced production requirements, such as fast paced assembly line work or high volume piecemeal quotas.

(Tr. 21).

At the fourth step, with the assistance of vocational expert testimony, the ALJ found Claimant could not perform his past relevant work (Tr. 28). The ALJ found that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Claimant is 'not disabled,' whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)." (Tr. 28.)

At the fifth step, the ALJ relied on the assistance of the vocational expert's testimony; the ALJ found that, considering the claimant's age, education, work experience, and residual functional capacity, there existed significant numbers of various light, unskilled jobs in the national economy that Claimant could perform, including three representative examples: a router, marker, and cleaner. *Id.* Therefore, the ALJ found that Claimant had not been under a disability from his alleged onset date of December 5, 2019, through the date of the decision on July 20, 2022 (Tr. 30). As a result, his applications for benefits were denied.

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant raised two vague, largely undeveloped challenges to the ALJ's decision that fail to specifically articulate any error in the ALJ's factfinding. First, Claimant argued that the ALJ did not satisfy her duty to develop the medical evidence and that she "completely ignored" Claimant's testimony and medical records. However, Claimant merely cited to a tangle of excerpts from his testimony; he did not allege any specific evidentiary gaps that needed developing, or even any limitations that are missing from

the RFC finding. Regardless, the ALJ fully detailed her factfinding in an extensive 17-page decision, and Claimant has not demonstrated any basis for a finding that the ALJ "completely ignored" all the pertinent evidence of Claimant's case. Claimant's second allegation of error claims that the ALJ failed to consider whether Claimant's impairments, in combination, medically equaled a Listing at step three of the sequential process. Claimant did not specify, however, what Listing he medically equaled or reference any medical evidence supporting his argument, and diagnoses alone are not sufficient to establish disability. And, in stark contrast to Claimant's perfunctory argument, the ALJ here spent five pages explaining in detail why Claimant's impairments did not meet the high bar for per se disability at step three. Ultimately, the ALJ's findings enjoy the support of substantial evidence, and Claimant has failed to demonstrate reversible error.

### A. Adequacy of the record

First, Claimant contended that the ALJ "completely ignored" Claimant's testimony as well as "medical documentation" from his treating physician regarding Claimant's medical and mental impairments and attendant limitations. (ECF No. 8 at 10-13.) However, Claimant's argument offered little more than the vague and conclusory assertion that the ALJ "failed in her duty to fully develop the Claimant's medical/mental evidence of his multiple medical conditions." *Id.* at 11. Claimant offered no elaboration to demonstrate in what way the evidence was not fully developed, did not identify any specific evidentiary gaps that needed developing, or even any limitations that are missing from the residual functional capacity ("RFC") finding. Instead, Claimant listed

the names of "certain impairments,"[4] and cited to portions of record evidence without any further explanation—leaving the Court to guess at its significance. This is improper.

Claimant's conclusory statement that the ALJ failed in some unspecified way to develop the record does not identify any error warranting remand. Although an ALJ has a duty to assist claimants in developing the record, "[she] is not required to act as claimant's counsel." *Weise v. Astrue*, No. 1:08-0271, 2009 WL 3248086, at \*4 (S.D. W. Va. Sept. 30, 2009). Indeed, "an 'ALJ is entitled to assume that a claimant represented by counsel is making h[er] strongest case for benefits.'" *Swafford v. Colvin*, 2:14-cv-14511, 2015 WL 5725825, at \*4 (S.D. W. Va. Sept. 30, 2015) (citing *Weise*, 2009 WL 3248086, at \*4). As this Court has previously explained:

> [Claimant] does not identify any gaps in the record or further evidence that the ALJ should have developed. She cites a legal standard and does not articulate how it applies to her case. [Claimant's] conclusory assertion that the ALJ failed to develop the record does not assert a viable challenge to the Commissioner's decision. Indeed, the Court should not be tasked with researching and constructing [Claimant's] arguments for her. [Claimant] fails to specify any deficiencies in the record . . . [Claimant] does not identify any further inquiries that the ALJ should have made or indicate what further evidence was necessary for the ALJ to render a decision on her disability applications. [Claimant] lists pieces of medical evidence in her brief, yet she does not explain how any of it prompted further investigation.

*Hensley v. Kijakazi*, 3:21-cv-00178, 2021 WL 5871542, at \*13-14 (S.D. W. Va. Nov. 23, 2021), adopted, 3:21-cv-0178, 2021 WL 5867126 (Dec. 10, 2021). *See also Heather M. v. Berryhill*, 384 F. Supp. 3d 928, 934 (N.D. Ill. 2019) ("Judges are not required to sift

---

[4] Claimant stated that these "certain impairments" which were not "fully developed" as follows: "osteoarthritis, bilateral carpal tunnel syndrome/surgery, scoliosis, shoulder and neck problems, dislocated hip, high blood pressure, high cholesterol, acid reflux, diabetes type II, diabetic neuropathy, ulcers on feet, plantar fasciitis, [Tourette's] syndrome and vision, adjustment disorder with mixed anxiety and depression mood, panic attacks, agoraphobia, obsessive compulsive disorder, autism spec, and intellectual disability" (ECF No. 8).

through the record without direction from counsel—especially a 1000-page record—and find evidentiary support for contentions tossed out like salt strewn on an icy sidewalk").

Importantly, at the hearing, the ALJ asked Claimant's counsel if he had the opportunity to review the record and if he had any objections (Tr. 47). Counsel had no objection, made no request to supplement the record, and did not ask the ALJ for more time to supplement the record. *Id.* Where, as here, the record comprised almost 300 pages of medical evidence, including copious treatment records and a prior ALJ decision dated just one day before his alleged onset date, Claimant has not feasibly shown that additional evidence was somehow required or that the ALJ erred by not developing the record. *See Farrell v. Astrue*, No. 3:11-cv-00503, 2012 WL 4378131, at *11 (S.D. W. Va. June 22, 2012).

Furthermore, even if Claimant's argument had been fully developed, an ALJ is not required to further develop the record if (1) there is sufficient information to form her conclusions, and (2) the ALJ's findings are supported by substantial evidence. Here, Claimant offered no basis for finding the ALJ's decision was not supported by substantial evidence, and his vague reference to portions of his medical records fails to demonstrate in any way that the ALJ lacked sufficient information to form the conclusions made in her written decision. To the contrary, the decision plainly shows that the ALJ *did* consider the evidence cited by Claimant, followed the proper legal standards in making her RFC finding, and explained how the record evidence supported her findings. The ALJ's ample discussion of the record evidence provided sufficient insight into her thought process and analysis for this Court to "trace the path" to her overall RFC finding, and no further development of the record was necessary. The ALJ fully considered the subjective allegations of Claimant, discussing the allegations from his function reports and his

testimony from his hearing such as his alleged difficulty reaching, lifting, walking, using his hands, and mental functioning (Tr. 22, citing Tr. 52-58, 349-53, 367-72). However, the ALJ concluded that Claimant's statements were "not entirely consistent with the totality of his treatment evidence and other factors discussed throughout this decision" (Tr. 23).

The ALJ spent the remainder of the decision supporting this conclusion with the record evidence, and explaining her conclusion that Claimant could perform a reduced range of light work. Regarding Claimant's physical functioning, the ALJ evaluated Claimant's combined physical impairments and reasonably concluded that Claimant's condition remained unchanged from the prior ALJ decision from December 4, 2019, just one day before Claimant's alleged onset date (Tr. 23). The ALJ explained that Claimant's treatment had been conservative since the prior decision, limited predominantly to medications with no significant side effects or complications and no further knee injections (Tr. 23). She further explained that the physical exams of Claimant's body systems reflected few significant issues, acknowledging Claimant's elevated blood sugar levels but contrasting it with his lack of distress throughout his appointments and generally normal exams of his pulmonary, cardiovascular, extremities, and musculoskeletal system, noting the various findings of normal gait, station, and strength (Tr. 23-24, citing, e.g., Tr. 529-30, 533-35, 554-55, 611-12, 631-32, 704-05, 708-09, 713-14, 716-18, 736-37, 732, 745-47).

The ALJ then turned to the relevant evidence of Claimant's mental functioning, acknowledging that Claimant continued to have mental impairments since the date of the prior decision, treating primarily with medications (Tr. 24). The ALJ further acknowledged Claimant's exacerbation of mental health symptoms in late December

2019, noting that it resulted in an extended hospital stay (Tr. 24, citing Tr. 481-86). However, the ALJ explained that this increase in symptoms lasted just six days before returning to baseline, and that the record as a whole noted various negative depressive screenings, little specialized mental health symptoms, and few psychological symptoms presented at his medical appointments (Tr. 24-25, citing Tr. 533, 539,551-52, 617-20, 630-32, 644-45, 705-06, 709-10, 713-14, 745-46). The ALJ further discussed at length the consultative exam from December 2020, detailing Claimant's mental status, his learning difficulties as a child, and his reported treatment history (Tr. 25, citing 599-602). The ALJ also considered the prior administrative medical findings, noting that they "appear to be a fair accurate estimation of the severity of [Claimant's] physical and mental restrictions and limitations" (Tr. 26, citing Tr. 115-17, 122, 142-44, 149, 166-67, 176-77). The ALJ therefore adopted the physical limitations found by the state agency consultants on reconsideration, but she found that the updated evidence of Claimant's mental impairments supported even greater mental limitations, which she included in Claimant's RFC (Tr. 27).

The ALJ concluded her analysis by explaining her finding that Claimant's allegations were not fully supported and that Claimant could perform a reduced range of light work (Tr. 26-27). She explained that she considered "subjective complaints with regard to pain, precipitating and aggravating factors, medications and other treatment, and any functional restrictions and claimant's daily activities" (Tr. 26). She explained, based on the relevant evidence previously discussed, that they were not supported by "the degree of medical treatment required, discrepancies between [Claimant's] assertions and information contained in the documentary reports, the medical history, the findings made

on examination, [Claimant's] assertions concerning his ability to work, and the reports of the reviewing, treating and examining physicians" (Tr. 27).

Next, the ALJ explained that Claimant's RFC was "supported by some of [Claimant's] own subjective allegations, the objective findings, the treatment [Claimant] received, [Claimant's] response to his prescribed treatment, and the record as a whole," which did not support any further limitations. This ample discussion of the relevant evidence and explanation of how this evidence supported the ALJ's conclusion that Claimant could perform a reduced range of light work amply clears the "not high" bar for substantial evidence. *Biestek*, 139 S. Ct. at 1154 (2019); *see Ladda v. Berryhill*, 749 F. App'x 166, 173 (4th Cir. 2018) (remanding for further function-by-function was not required where the ALJ "sufficiently explained his conclusions" and "used evidence from the record to explain" the RFC finding). In response to the ALJ's thorough analysis, Claimant's citation to various diagnoses fails to show that further limitations were warranted; his citation to mere diagnoses, standing alone, is insufficient to warrant remand. Rather, "[t]here must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Claimant has simply not shown how these additional diagnoses caused any particular functional loss.

Finally, the ALJ fully recognized Claimant's allegations and diagnoses in her discussion of Claimant's severe impairments (Tr. 15), her discussion of whether Claimant met a listing (Tr. 16-21), and in her RFC analysis (Tr. 21-27). The ALJ fully considered the evidence Claimant cites, and to the extent the ALJ did not discuss every allegation of Claimant or every medical note in the record, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *Manigo v. Colvin*, 2015 WL 74954, at *5

(D.S.C. Jan. 6, 2015) (explaining that "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered") (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Simply put, "there is no particular language or format that an ALJ must use in [her] . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." *Clark v. Comm'r of Soc. Sec.*, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." *Id*. On review, the ALJ's written decision thoroughly explained the ALJ's reasoning for her determination, and she specifically tethered her findings to the record, with a clear and logically reasonable weighing of the evidence—including the medical evidence—using the guideposts of supportability and consistency. Accordingly, the undersigned **FINDS** that the ALJ's decision is supported by substantial evidence, and therefore it is respectfully recommended that Claimant's request for relief be denied, and the Commissioner's decision be affirmed.

### B. Listing of Impairments

Lastly, Claimant argued that the ALJ failed to properly consider Claimant's impairments pursuant to the Listings. To support his argument, Claimant once again merely listed his diagnoses—citing no actual record evidence—and purports that, together, those diagnoses equaled the requirements of some unspecified Listing. This argument is without merit.

The Listings are a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe that they would be disabled regardless of their vocational background. *Zebley*, 493 U.S. at 532.

For an impairment to be considered "medically equivalent," it must be at least equal in severity and duration to all of the criteria of any Listing. 20 C.F.R. §§ 404.1526(a), 416.926(a); *Zebley*, 493 U.S. at 531. As a result, Claimant was required to prove that he "meet[s] all of the specified medical criteria" to meet or medically equal a Listing. *Id.* at 530. Meeting only some criteria, "no matter how severely, does not qualify." *Id.* Further, Claimant bears the burden of proving that he met or equaled the criteria set forth in any Listing. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).

Significantly, a claimant cannot qualify for benefits under the "equivalence" step by showing that the overall or accumulated functional impact of his combination of impairments is as severe as that of a listed impairment. Zebley, 493 U.S. at 532 (citing Social Security Ruling (SSR) 83-19, 1983 WL 31248, at *3 ("[I]t is incorrect to consider whether the listing is equaled on the basis of an assessment of overall functional impairment.")) (emphasis in original). Moreover, a conclusory statement that a combination of impairments medically equaled a Listing is insufficient to satisfy a claimant's burden of proof. *See Byrd v. Apfel*, 168 F.3d 481, at *4-5 (4th Cir. 1998) (rejecting the appellant's argument that a combination of impairments that "come close" to meeting other listings medically equals a Listing, and finding a conclusory statement that a combination of impairments medically equaled a Listing was insufficient to satisfy a claimant's burden of proof). Here, Claimant failed in his burden of proving that he met or equaled a Listing. First and foremost, similar to the deficiency plaguing Claimant's first argument, this argument is perfunctory and undeveloped. Despite arguing that his

various diagnoses met or equaled a Listing, Claimant does not identify which Listing he believes his combination of impairments meets or medically equals (Pl. Br. 13-14). As this Court previously explained in the *Hensley* case, "[Claimant's] conclusory assertion that her multiple impairments 'when combined, totally disable her and exceed the combination of impairments listing' fails to assert a specific challenge to the Commissioner's decision," and "[Claimant] effectively waived this challenge by raising it only in a conclusory fashion." *Hensley*, 2021 WL 5871542, at *16; *see also Adkins v. Colvin*, 3:14-27920, 2016 WL 854106, at *9 (S.D. W. Va. Feb. 11, 2016), adopted, 2016 WL 868342 (Mar. 4, 2016) (affirming where the claimant failed to identify the listing he allegedly met in combination).

Second, Claimant merely speculates that an unknown Listing was satisfied without pointing to any evidence that would meet the criteria of a Listing (Pl. Br. 13-14). Simply noting his various diagnoses is insufficient to demonstrate that he met or medically equaled a Listing based on his combination of impairments. *See* 20 C.F.R. §§ 404.1525(d), 416.925(d) ("Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis."); *Byrd*, 168 F.3d 481, at *4 ("It is not enough that the impairment have the diagnosis of a listed impairment; it must also have the findings shown in the listing of that impairment."). As such, even without considering that Claimant waived the argument, he still failed to meet his burden of proof at the third step of the sequential evaluation process. *See Raines v. Kijakazi*, 3:21-0045, 2021 WL 4258733, at *12 (S.D. W. Va. Aug. 27, 2021), adopted, 2021 WL 4255625 (Sept. 17, 2021) (affirming where the claimant did not specify what evidence was "inadequately fleshed out" in evaluating her impairments in combination, nor what evidence "specifically supports" per se disability).

Third, the ALJ considered the combined effects of Claimant's impairments. At step three, the ALJ explicitly concluded, "[Claimant] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" (Tr. 19) (emphasis added). And, later in the decision, when making the RFC finding, the ALJ indicated she did so, "[a]fter careful consideration of the entire record, . . ." (Tr. 21) (emphasis added). Where the ALJ states that she has carefully considered the entire record, "absent evidence to the contrary," a reviewing court should "take her at her word." *Reid*, 769 F.3d at 865.

Finally, the ALJ here spent over five pages addressing the relevant Listings (Tr. 16-21). She evaluated Claimant's musculoskeletal issues under Listings 1.15, 1.16, and 1.18 (Tr. 16), his carpal tunnel syndrome under Listing 11.00 (Tr. 17), and his bipolar disorder, anxiety disorder, and borderline intellectual functioning under Listings 12.04, 12.06, and 12.11 (Tr. 18-21). The ALJ further noted that some impairments, including hypertension, hyperlipidemia, diabetes mellitus, and obesity, do not have corresponding Listings, and thus she properly evaluated them through their effects on other body systems in accordance with the applicable regulations (Tr. 16- 18). An ALJ properly considers impairments in combination where—as in this case—she discusses each impairment separately and finds that the claimant's impairments, when considered together, did not prevent him from performing work activity. *See e.g*., *Hundley v. Kijakazi*, 3:21-cv-00568, 2022 WL 1197031, at *13 (S.D. W. Va. Mar. 31, 2022), adopted, 2022 WL 1196983 (Apr. 21, 2022), *Wiseman v. Colvin*, 3:14-CV-28750, 2015 WL 9075457, at *19 (S.D. W. Va. Nov. 24, 2015), adopted, 2015 WL 9008899 (Dec. 15, 2015); *see also Adkins*, 2016 WL 854106, at *9 (finding substantial evidence supported the ALJ's decision where the ALJ considered the claimant's impairments in the listings analysis and in rendering the RFC).

In sum, the ALJ in this case did exactly as required with regard to consideration of all Claimant's impairments in combination at step three, and Claimant has failed to demonstrate any error requiring remand.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 8), **GRANT** the Commissioner's request to affirm her decision (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: February 29, 2024

Dwane L. Tinsley
United States Magistrate Judge